MATHIAS FERRARIA *et al.*, Plaintiffs in Error, *v.* JOHN VASCONCELLES *et al.*, Defendants in Error.

ERROR TO MORGAN.

Under the statute authorizing the formation of religious corporations, the certificate by the trustees should state the time for which they are elected, should be under seal, and verified by affidavit, and, generally, the statute must be substantially complied with, and all its express requirements must be observed.

The title to church property, in case of a division of a religious corporation, remains with that portion of the church which adheres to the tenets and discipline of the organization to whose use the property was originally dedicated, even although it may be in a minority.

THIS was a suit in chancery, commenced by Mathias Ferraria and others, trustees of the Free Portugese Church, in Jacksonville, in the Morgan county Circuit Court of Illinois, WOODSON, Judge, presiding, against John Vasconcelles and others, who claim to be trustees of said church. The bill of complainants sets forth, that on or about the year 1851, in the town of Jacksonville, Morgan county, and State of Illinois, there was organized a religious body, under the name of the Free Portugese Church, and the persons composing said church were members of the Free Church of Scotland, and were under the care of the Free Church Presbytery of Glasgow, Scotland. After which it was determined

by said organization to purchase a lot of ground on which to erect a church edifice as a place for worship. The purchase was made on the 1st day of September, 1852; they obtained a deed for said lot; they paid for said lot $250, in 1852, or about that time; they erected a church edifice, part of the cost of which was subscribed and paid by the complainants and members of said church, and by others in the community disposed to assist them; but a large portion of the money paid for the building of said church was donated for the said building as of the Old School Presbyterian order, by the Old School Presbyterian Churches in the Eastern States. In 1856, the said church numbered about one hundred and twenty-eight members. In the same year (they having been regularly dismissed from the Presbytery of Glasgow, Scotland,) they made application to be received into and taken under the care of the Old School Presbytery of Sangamon, which application was accepted, and they were received on the 5th day of April, A. D. 1856. This act on the part of the said church was performed with the unanimous consent of the church; and by this act they became members of the Old School Presbyterian Church. From the 5th of April, 1856, they were subject to and governed by all the authority of the Old School Presbyterian Church.

In the spring of 1858, about the 3rd of April, the defendants, and others with them, held a meeting and determined to withdraw from said church, which they did.

Afterwards, the defendants, with others unknown, held another meeting and determined to expel from, and by force prohibit, any of the members of said church from worshiping in said house or place of worship; and did eject, and by force put some of said members (who had not seceded) out of the house, and prohibited others of said church from worshiping therein, by bolting and barring the doors of said house against them. They also have, and do to this day, continue to refuse the complainants and all those who still belong to the said Presbyterian Church, admittance to said house of worship.

On the 17th day of May, 1858, the plaintiffs in error were regularly elected trustees of said church. The election and proceedings of the defendants in error, who claim to be trustees of said church, are irregular. The prayer of said bill is for the peaceable possession of the church property, etc. To this bill the defendants answer that they are the lawfully constituted trustees of said church, and that the title to said house and lot is vested in them and their successors in office, in trust for the majority of said church, and deny that the plaintiffs in error are the legally authorized trustees of said church;

that in the spring of 1858, said church held a meeting and took a vote as to whether they should remain in the said presbytery, and the vote resulted 89 in favor of presbytery, and 106 against; that they have never refused said plaintiffs or any of said members the privilege of worship in said house, and that the election of plaintiffs was not held at the said house of worship; that the moneys collected for the building of said house were raised irrespective of its denominational character. To which answer the plaintiffs in error filed a general replication, and on the trial of said cause, and after hearing the proof in the same, the court dismissed said bill of complainants.

M. McCONNELL, and I. J. KETCHUM, for Plaintiffs in Error.

D. A. SMITH, for Defendants in Error.

WALKER, J. The first question presented by this record which we propose to consider, is, in whom is the legal title to this property vested? The conveyance by the grantor to the five persons named as trustees in the deed, is not questioned, and we may assume that, on the first day of September, 1852, the title was vested in them for the use of the church. Afterwards there was, on the 8th day of October, 1855, an effort to incorporate the church under the 3rd division of the 25th chapter, R. S., entitled "Corporations." The 44th section of that chapter authorizes the members of any society or congregation formed in this State for purposes of religious worship, to receive or purchase and hold real estate, not exceeding ten acres, and to assume a name, and to elect or appoint any number of trustees, not exceeding ten, to be styled trustees of such society or congregation by the name assumed, and that the title to land purchased shall vest in the trustees, by that name.

The 45th section provides that, immediately after the trustees are elected or appointed by such society, as provided in the preceding section, the persons elected or appointed shall make a certificate under their hands and seals, stating the date of their election or appointment, the name of the society, and the length of time for which they were appointed or elected, which is required to be verified by affidavit of some one of the persons making the same, and that it shall be recorded in the recorder's office of the county in which the society is formed, and that the trustees shall hold their office during the period stated in the certificate. It also provides for electing successors to such trustees, at the expiration of the term of their office, and that the trustees whose term of office shall have expired, shall make

a like certificate, signed and verified, to be recorded in the same manner as is required in the first instance. The latter clause of the 49th section provides that the rights and powers conferred by that division shall not be exercised by such society until its provisions shall have been complied with.

It will be observed that the certificate of the 8th of October, 1855, wholly fails to state the length of time for which the persons elected were to serve as trustees, the certificate is not under seal, and in both of these respects fails to comply with the requirements of the statute. It was not recorded until the 16th of April, 1858, two years and a half after the election, and this, too, without having been verified by affidavit. It is true, that after it was recorded, and on the seventh day of May following, it was verified by the affidavit of one of their number, and appears to have been again recorded on that date. Even this certificate was not amended so as to meet the requirements of the statute, by having seals attached, and stating the period for which the trustees had been elected. Up to this time, there was certainly no such compliance with the statute as created them a corporation, and the property did not, nor could it, by anything they had done, vest in these trustees. The statute must be at least substantially complied with in its provisions, and all of its express requirements must be observed. We have no power to dispense with such requirements, and render illegal acts valid and binding. It is not within the province of the court to question the propriety of such requirements when imposed by the legislature, and in this case they are few, simple, and easily performed. But whether they are the most salutary is not a question which we can consider; they have been imposed as a condition to the organization of these corporations, and must be performed before corporate rights can attach. And this is expressly declared to be the legislative will by the latter clause of the forty-ninth section of that division.

The question is then presented, whether the election held on the eighteenth day of May, 1858, after the division in the church had occurred, and which was duly signed, sealed, verified, recorded, and certified the length of time for which the trustees were elected, and was in other respects in the form required by the statute, organized a corporation, and vested the title to the property in that body of trustees. To determine this question, it will be necessary to ascertain what effect, if any, the vote of the church in favor of withdrawing from its connection with the Sangamon Presbytery, resulting in a division and separate organizations, had upon the right to this property.

That the minority who elected trustees on the 18th of May, 1858, are still adhering to the faith of the body of which this

church was a constituent part, seems to be incontrovertible from the evidence, which shows that they adhere to the decision of the ecclesiastical court, which, by the constitution of the Presbyterian Church, is invested with the power to determine such questions. The jurisdiction of that tribunal is not denied, but it is insisted by the secessionists that, when the church attached itself to the presbytery, it was agreed that the question as to the validity of the baptism of the Roman Catholic Church should be waived, and that both parties in future should exercise forbearance, and that the having the question presented to, and decided by the presbytery, was an act of bad faith, which absolved them from all obligation to continue their connection with the presbytery. It nowhere appears that the presbytery was a party to this arrangement, but so far as the evidence shows, it was confined alone to the members of this church. The defendants have failed to show that there is any provision in the constitution of the Presbyterian Church, as it is organized in this country, which authorizes an individual church to withdraw from the body. Nor was any authority produced to show the existence of such a right. With temporal, as well as ecclesiastical governments, as a general rule, there is no means by which any of the subordinate members of the government, or even the individuals attached to the organization, may, without the consent of the body, sever their connection with the organization. This is true of most of the moral, benevolent, and other associations of this and other countries. And the presumption, in the absence of proof, is that the constitution of the Presbyterian Church as a body, in this country, recognizes no such right. By the organic law of that body, a member cannot withdraw from the church without the assent of the session, nor can a church withdraw from its presbytery without the consent of the synod, and all efforts to do so are irregular and revolutionary, according to the law of their organization. After individuals or organized bodies have entered into a compact or agreement, it requires the assent of the contracting parties to abrogate the agreement, and no reason is perceived, on this principle, why a church which, by compact, has become a portion of the presbytery, should have the voluntary right to withdraw from the organization without mutual consent. No such right has been proved to exist by the usages of the Presbyterian Church.

In the case of *Shannon* v. *Frost*, 3 B. Mon. 253, the court say of the withdrawing members: "They not being now members of the church to whose use the ground was conveyed, the appellants seem no longer to be entitled to any beneficial interest in that property, nor to any other right which this court can either enforce or recognize; and consequently, the old church,

as organized at the date of that conveyance, and still subsist-
ing, must be entitled to the exclusive use and enjoyment of the
property for all the purposes for which it was first dedicated,
and as that right is of the character of a trust, is it not the duty
of a court of equity to uphold it, and secure its full and undis-
turbed enjoyment?" In the same opinion, the court hold, that
as the conveyance was to the church, as an organized body of
professing christians, every member of that church had a bene-
ficial interest in the property thus conveyed, so long as he or
she continued to be a member, but no longer. That it is only
as a constituent element of the organized body or church,
that any person can acquire, or hold, as *cestui que trust*, any
interest in the property. And they refer to *Curd* v. *Wallace*,
7 Dana, 195, in support of this doctrine. The court say that
the judicial eye cannot penetrate the veil of the church, for the
forbidden purpose of vindicating the alleged wrongs of the
excised members; that when they became members, they did so
upon the condition of continuing or not, as they and their
churches might determine; that they thereby submitted to the
ecclesiastical power, and cannot invoke the supervisory power of
the civil tribunals.

The same court, in the case of *Gibson* v. *Armstrong*, 7 B.
Mon. 481, announce the rule, that in case of the division of the
local society into two organized parts, though the individuals of
each party might still answer to the general description of the
beneficiaries described in the deed, that it does not follow that
each party would be entitled to the use of the house of worship.
That the use belongs, in subordination to the rules of discipline,
to the local society and to individuals as members of it. The
title to the use, so far as it depends upon the deed, must, in case
of a divided society, be determined by the question, which of
the two contending bodies is entitled, according to the rules and
discipline, and the laws of the church, to be regarded as the
true society, by which and for whose use the lot was purchased,
and the building erected and held? The court say that they
will not determine that there could not be a case of friendly
and authorized division of a local society, when being recog-
nized by the other, and by the higher authorities of the church,
which might be entitled to participate in the use which had
belonged to the united body. But next to the diffusion of the
christian faith and morals, the church has in view the promo-
tion of union and harmony, and order and subordination
throughout every part of the great association for whose gov-
ernment they were intended. They hold that the separating
body cannot, by its own mere will, nor by assuming an internal
organization conforming to the rules and discipline, and usages

of the church, nor by placing over itself a preacher of its own choice, nor by claiming to be the true and only society of the church belonging to the place, become *ipso facto* an·organized portion of the general body, or church, until recognized by the proper authority of the church, and that it would stand as an isolated body, unconnected with the general organization, and independent of it.

Again, in the case of *Hadden* v. *Churn*, 8 B. Mon. 70, the same court hold, that it is not material whether the separating members be regarded as expelled or seceding from the church, in reference to their claim. They say the question is, whether they are the church or party for whose use the property has been dedicated. And that if they are not, it is manifest they have no interest.

In this case there can be no doubt that the complainants are still conforming to the usages and discipline of the church as it was organized when the conveyance was made, and are submitting to the jurisdiction and authority of the higher tribunals of the organization of the Presbyterian Church, while the defendants have withdrawn all connection with it and attached themselves to another and wholly different organization. This the evidence shows, and the fact is not controverted. Then, notwithstanding the cases above referred to were each where the separating body were the minority, and not a majority, as in this case, still the principles announced, must and do cover a case, where the smaller number adhere to the usages, tenets and discipline of the church, as fully as if they were the greater number. The object of the donations of money, the purchase of the property and the erection of the church edifice, was to afford a place of worship according to the usages and principles of the body as then organized, and not according to the usages of some other body. When the defendants and their party withdrew from the church, and refused to recognize its authority, they abandoned all right to the use of the property as an independent body or organization. They no longer constituted the same church or any part of it, as it was organized, when the property was acquired, and are not entitled to its use, but in our opinion the complainants and their party are entitled to its exclusive use.

The defendants having failed to comply with the statute in their effort to become incorporated, and even if their last amendment and record of their certificate had been in the time required by the statute, which we are not prepared to admit, the property remained in the trustees named in the deed, up to the 18th day of May, 1858. And as the church or body who then conformed to the original usages of the church, and were, as we think, the church answering the description of the body

named in the deed, and for whose use it was procured, in compliance with the statute, elected trustees and became incorporated, under the statute, they hold the legal title as well as the equitable right to its exclusive possession and enjoyment. Wherefore, the .decree of the court below is reversed, and the cause remanded for further proceedings.

*Decree reversed.*